UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 17-CV-3757 (JFB)

———————————

EDUARDO CRUZ,

Petitioner,

VERSUS

JOHN COLVIN,

Respondent.

———————————

**MEMORANDUM AND ORDER**
August 14, 2019

———————————

JOSEPH F. BIANCO, Circuit Judge (sitting by designation):

Eduardo Cruz ("petitioner"), proceeding *pro se*, petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction entered on July 19, 2013, in the Supreme Court of the State of New York, Nassau County (the "trial court"). Following a jury trial, petitioner was convicted of nine counts of robbery in the first degree, N.Y. Penal Law ("N.Y.P.L.") § 160.15(3), (4); five counts of robbery in the second degree, N.Y.P.L. § 160.10(1), (2)(a); five counts of burglary in the first degree, N.Y.P.L. § 140.30(2), (3), (4); one count of burglary in the second degree, N.Y.P.L. § 104.25(2); two counts of assault in the second degree, N.Y.P.L. § 120.05(6); two counts of criminal possession of a weapon in the fourth degree, N.Y.P.L. § 265.01(2); three counts of unlawful imprisonment in the second degree, N.Y.P.L. § 135.05; escape in the third degree, N.Y.P.L. § 205.05; resisting arrest, N.Y.P.L. § 205.30; criminal possession of stolen property in the fifth degree, N.Y.P.L. § 164.50; and one count of attempted unlawful imprisonment in the second degree, N.Y.P.L. §§ 110.00/135.05. Petitioner was sentenced to an aggregate determinate term of twenty-five years' incarceration followed by five years of post-release supervision. Five orders of protection were signed ordering petitioner to stay away from Shabnam Muzafar, Ashad Sumra, Ghulam Sumra, Harris Sumra, and Mohammad Shafique until September 18, 2044. Petitioner was also required to pay $2,819.34 in restitution.

In the instant case, petitioner challenges his conviction on the following grounds: (1) his arrest was the product of a Fourth Amendment violation; (2) his confession was involuntary; (3) there was insufficient

evidence to find physical injury; (4) he received ineffective assistance of counsel; and (5) the concurrent inclusory counts should be dismissed.

For the reasons set forth below, the petition for a writ of habeas corpus is denied in its entirety. Specifically, the Court concludes that petitioner's first and third claims are procedurally barred from habeas review. Moreover, the Court concludes that all of petitioner's claims, including the first and third claim, are without merit.

### I. BACKGROUND

A. Factual Background

On September 19, 2011, petitioner was arrested, along with three other co-defendants, and charged with nine counts of robbery in the first degree, five counts of robbery in the second degree, five counts of burglary in the first degree, one count of burglary in the second degree, two counts of assault in the second degree, two counts of criminal possession of a weapon in the fourth degree, three counts of unlawful imprisonment in the second degree, one count of escape in the third degree, one count of resisting arrest, one charge of criminal possession of stolen property in the fifth degree, and one count of attempted unlawful imprisonment in the second degree. (Tr. 7; Resp't's Aff. ¶ 25, ECF No. 7.)[1] These charges arose from petitioner's participation in a home invasion that occurred at 1350 Bellmore Avenue in North Bellmore, New York.

1. The Evidence

a. The Home Invasion

On September 19, 2011, at approximately 8:30 a.m., petitioner entered the home at 1350 Bellmore Avenue in Nassau County, and encountered Shabnam Muzafar ("Muzafar") in the kitchen. (Tr. 325, 327.) He approached Muzafar from behind, held a knife to her neck, and moved her into her bedroom. (Tr. 325-327.) While petitioner held Muzafar down, co-defendants Gustavo Arroyo ("Arroyo"), carrying a knife, and Carlos Segura ("Segura"), carrying a gun, entered the home and tied her up. (Tr. 327-30, 332-33, 593, 595.)

At this point Arshad Sumra ("Sumra"), Muzafar's husband, knocked on the front door after returning home from dropping his son off at school. (Tr. 333-334, 589-90.) Segura went to answer the door, while petitioner received a phone call. (Tr. 334, 594.) Segura opened the door, placed a gun on Sumra's neck, and proceeded to walk him to the bedroom where Muzafar was tied up. (Tr. 334-335, 592-593.) The three co-defendants proceeded to ransack the room, beat the victims, and tie up Sumra and Mohamed Shafique ("Shafique"), who was visiting from Pakistan and staying at the house. (Tr. 322, 334, 336-37, 340-41, 343, 596-97). After the co-defendants demanded money, Sumra pointed them to a jacket that had about 6,000 dollars and Muzafar's jewelry in it, which the co-defendants took. (Tr. 337-40, 598-99.) He also told them that his brother, Ghulam Sumra ("Ghulam"), was in the basement and had money, prompting petitioner to go downstairs. (Tr. 595-96, 600.)

Once downstairs, petitioner put a knife to Ghulam's throat and demanded money from him. (Tr. 905-06.) Petitioner then stole Ghulam's cellphone and money and tied him up with the wire of the cellphone charger. Petitioner also spoke on his [petitioner's] phone before exiting the room. (Tr. 906.) Phone records introduced into evidence at trial corroborate that a cellphone associated with petitioner was in communication with a cellphone associated with Dario Guerrero

---

[1] Citations to "Tr." refer to the transcript of petitioner's trial. (ECF Nos. 7-12 to 7-15.)

("Guerrero"), the driver of the getaway car, during the relevant time period. (Tr. 1096.)

While Cruz was downstairs, Harris Sumra ("Harris"), Muzafar's and Sumra's son, arrived at the house. (Tr. 345, 600-01.) As Harris approached the house, he noticed a white car resembling a law enforcement vehicle that had a spotlight and no front license plate. (Tr. 815.) He began knocking on the door of the house, when he saw the man in the driver's seat of the white car, who was on the phone and looking at him. (Tr. 816.) Arroyo answered the door and tried to pull Harris inside. (Tr. 817, 824.) As Arroyo tried to grab Harris, Harris's shirt ripped allowing him to escape Arroyo's grip and run for help. (*Id.*)

Gina Weiss ("Weiss"), who was driving in the neighborhood, saw Harris searching for help and stopped her car to help him. (Tr. 430-32.) As Harris was explaining what had happened to Weiss, the perpetrators got into the white car, which began heading south on Bellmore Avenue. (Tr. 431-32, 435-37, 818.) Andrew Smart ("Smart"), a driver who happened to be passing by, saw the white car make a sharp U-turn and saw people running from the house into the car. (Tr. 284-86.) He pulled up next to Weiss to ask what happened and then proceeded to follow the white car. (*Id.*) Both Smart and Weiss called police to report what they had seen. (Tr. 288, 432.)

### b. The Arrest

At 9:04 a.m. on September 19, 2011, Sergeant John Lezamiz ("Sergeant Lezamiz") received a radio transmission, stating that there was an armed burglary in progress at 1350 Bellmore Avenue where victims were tied up. (Tr. 948.) As Sergeant Lezamiz began driving towards the address, more transmissions came in with details of the incident. (Tr. 949.) Sergeant Lezamiz learned that four suspects were in a "white Crown Victoria with Pennsylvania plates, tinted windows, bumper stickers on the back, and… a police spotlight on the car." (*Id.*) The suspects were described as two Black males, one Hispanic male, and one unknown fourth person. (*Id*.)

As Sergeant Lezamiz approached the intersection of Mill Road and Merrick Road, he noticed a car stuck in traffic that matched the one described in the transmissions. (Tr. 950.) By the time Sergeant Lezamiz turned around, the car was gone. (*Id*.) He radioed in that he had spotted the vehicle and assigned officers to canvas the Meadowbrook Parkway, which was where he thought the car was heading. (Tr. 951.)

Sergeant Lezamiz continued on Merrick Road toward the scene of the crime when he again spotted the vehicle. (*Id*.) He turned on his sirens and lights and the vehicle pulled over near Babylon Turnpike and Merrick Road. (*Id*.) Sergeant Lezamiz exited his car, drew his gun, and demanded that the suspects exit their vehicle. (Tr. 952.) As the suspects exited the vehicle, Sergeant Lezamiz saw petitioner reach for his waistband. (Tr. 953.) Sergeant Lezamiz therefore commanded the suspects to put their hands above their head, which they did. (*Id*.) He further instructed them to lay face down on the sidewalk and they complied. (Tr. 954.)

While petitioner was on the ground, Sergeant Lezamiz put his weight on petitioner to arrest him first, because he believed that petitioner was armed with a weapon from petitioner's earlier motions towards his waistband. (Tr. 953, 956.) Sergeant Lezamiz handcuffed one of petitioner's hands, but struggled to simultaneously handcuff petitioner's other hand and keep his gun drawn. (Tr. 956.) As Sergeant Lezamiz was attempting to handcuff petitioner, Arroyo got up and began to run east on Merrick Road towards Lindenmere. (*Id*.) Sergeant Lezamiz yelled at Arroyo to stop, but remained on top of petitioner to keep him under control. (Tr.

3

957.) Guerrero and Segura then got up and ran back in their car. (*Id.*) While still attempting to maintain control of petitioner, Sergeant Lezamiz turned towards Guerrero and Segura and demanded that they get out of their car. (*Id.*) Petitioner then overpowered Sergeant Lezamiz, escaped from underneath him, and began to run away towards East Lake School. (*Id.*) Guerrero began driving at Sergeant Lezamiz who responded by firing four rounds into the car, causing Guerrero to swerve around him and continue east on Merrick Road. (*Id.*)

Sergeant Lezamiz proceeded to transmit his location, as well as the direction in which both Arroyo and the vehicle fled. (Tr. 958-59.) Officer Daniel Clarke ("Officer Clarke") and Officer John Billelo ("Officer Billelo") went to Sergeant Lezamiz's location in their marked police car. (Tr. 959.) Those officers saw Sergeant Lezamiz running and gesturing toward petitioner and so they continued in their car to catch petitioner. (Tr. 402, 923, 959-60.) Officer Clarke and Officer Billelo caught up with petitioner and tried to stop him in their car. (Tr. 403, 923.) Unable to do so, both officers got out of their car and began chasing petitioner on foot. (Tr. 403, 923.) In a continued effort to escape, petitioner jumped over a fence onto a residential property and hid in ornamental grass. (Tr. 403, 924.) Shortly after, Officer Clarke found petitioner with one hand handcuffed and yelled to Officer Billelo that he found petitioner hiding in the grass. (Tr. 404, 926-27.) At approximately 9:20 a.m., Sergeant Lezamiz arrived at 17 Babylon Road, where petitioner was found, and proceeded to track down Arroyo. (Tr. 404, 406, 927-28, 960-61).

### c. Post-Arrest Events

Officer Clarke and Officer Billelo transported petitioner to the First Precinct. (Tr. 407.) Billelo brought petitioner to room number three, where he remained with petitioner until Detective John Espina ("Detective Espina") arrived. (Tr. 930-31, 980-81.) The officers each testified that no officer interrogated or coerced petitioner in between the time of apprehension and transportation to the room in the First Precinct. (Tr. 410-11, 931.)

Upon entering room number three, at about 3:05 p.m., Detective Espina began collecting pedigree information from petitioner. (Tr. 982.) Petitioner spoke only Spanish and Detective Espina was a fluent Spanish speaker. (Tr. 976, 981.) At about 5:30 p.m., Detective Espina returned to petitioner after collecting pedigree information from petitioner's co-defendants. (Tr. 984-85, 996, 1016-17.) Detective Espina read petitioner his *Miranda* rights in Spanish off of a card that they both signed. (Tr. 986-87.) Detective Pollock ("Pollock") also signed the card as a witness to the interaction. (Tr. 986.) Petitioner then waived his *Miranda* rights. (Tr. 989-90.) Petitioner then spoke with Detective Espina about the incident. (Tr. 990-95.) Detective Espina left the room after the questioning, but returned to take a buccal swab from petitioner at 9:15 a.m. the next morning, and to take a written statement. (Tr. 996-97.)

### B. Procedural History

#### 1. Pre-Trial Hearing

A pre-trial hearing was held, beginning on April 12, 2012, regarding whether there was probable cause to arrest petitioner and his co-defendants, and the admissibility of petitioner's statements and other evidence. (*See generally* H.)[2] As relates to petitioner, the proceedings included *Mapp* and *Huntley* hearings. (H. 3.) After that hearing, the court

---

[2] Citations to "H." refer to the transcript of petitioner's pre-trial hearing. (ECF Nos. 7-10 and 7-11.)

4

granted petitioner's severance motion. (Resp't's Aff. ¶ 27.)

2. Jury Trial

Following a jury trial, petitioner was convicted on October 2, 2013, of nine counts of robbery in the first degree, N.Y.P.L. § 160.15(3), (4); five counts of robbery in the second degree, N.Y.P.L. § 160.10(1), (2)(a); five counts of burglary in the first degree, N.Y.P.L. § 140.30(2), (3), (4); one count of burglary in the second degree, N.Y.P.L. § 104.25(2); two counts of assault in the second degree, N.Y.P.L. § 120.05(6); two counts of criminal possession of a weapon in the fourth degree, N.Y.P.L. § 265.01(2); three counts of unlawful imprisonment in the second degree, N.Y.P.L. § 135.05; escape in the third degree, N.Y.P.L. § 205.05; resisting arrest, N.Y.P.L. § 205.30; criminal possession of stolen property, N.Y.P.L. § 164.50; and one count of attempted unlawful imprisonment in the second degree, N.Y.P.L. §§ 110.00/135.05. (*See* S. at 4-5[3]). Petitioner was sentenced to an aggregate determinate term of twenty-five years' incarceration followed by five years of post-release supervision. (*Id* at 5.) Five orders of protection were signed ordering petitioner to stay away from Muzafar, Sumra, Ghulam, Harris, and Shafique until September 18, 2044. (*Id*.) Petitioner was also required to pay $2,819.34 in restitution. (*Id.*)

3. Direct Appeal

Petitioner appealed his conviction to the New York Supreme Court, Appellate Division, Second Department. He raised the following issues on appeal: (1) two cellphones and the defendant's verbal and written statements should have been suppressed as fruit of an arrest that violated the Fourth Amendment; (2) the defendant's convictions and sentences charging resisting arrest and escape in the third degree must be vacated because the arrest lacked probable cause; (3) two counts of robbery in the second degree, two counts of burglary in the second degree, and two counts of assault in the second degree should be dismissed against the weight of the evidence because there was no legally sufficient evidence of physical injury; (4) the convictions and sentences for six counts of robbery in the first degree and two counts of burglary in the second degree should be vacated as the government failed to prove beyond a reasonable doubt that any property was taken from Arshad Sumra or Shabnam Muzafar; (5) the defendant's convictions and sentences should be set aside as he received ineffective assistance of counsel; (6) the court erred when it failed to dismiss the concurrent inclusory counts in the indictment; (7) the defendant's verbal, written and video recorded statements should have been suppressed as they were involuntary; and (8) the defendant's sentence should be set aside as retaliatory (in response to petitioner exercising his right to a jury trial), excessive, and harsh. (ECF No. 7-1.)

The Second Department affirmed petitioner's judgment of conviction. *People v. Cruz*, 137 A.D.3d 1158 (N.Y. App. Div. 2016). The Second Department held that: (1) the contention that there was no probable cause for arrest was unpreserved for appellate review, and in any event, the police only needed reasonable suspicion to stop the vehicle the defendant was in, which they had from the radio transmissions they received, and this reasonable suspicion "escalated to probable cause for arrest when, according to the police sergeant's hearing testimony, the defendant 'knock[ed]' the police sergeant off of him and fled the scene;" (2) the contention that "the two counts of robbery in the second

---
[3] "S." refers to the transcript of petitioner's sentencing. (ECF No. 7-16.)

5

degree, two counts of burglary in the second degree, and two counts of assault in the second degree should be dismissed against the weight of the evidence because there was no proof of physical injury" fails because it was unpreserved for appellate review and the evidence was legally sufficient to support the finding of physical injury and the verdict was not against the weight of the evidence; (3) the contention that there was not legally sufficient evidence that property was stolen is unpreserved for appellate review, the evidence was legally sufficient, and the verdict was not against the weight of the evidence; (4) defendant received effective assistance of counsel; (5) the hearing court properly denied the suppression of the statements the defendant made after arrest because the defendant knowingly and willingly waived his *Miranda* rights; and (6) the claim that the defendant's sentence was retaliatory is unpreserved and without merit. *Id.* at 1158-60.

On April 29, 2016, petitioner filed an application with the New York Court of Appeals for leave to appeal from the Second Department's order on his claims regarding his arrest lacking probable cause, dismissal of concurrent inclusory counts, and ineffective assistance of counsel. (*See* ECF No. 7-4.) The Court of Appeals denied petitioner's application for leave to appeal on June 3, 2016. *Id*.

4. Instant Petition

On May 7, 2013, petitioner, proceeding *pro se*, filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner claims that: (1) the police officers lacked probable cause to stop, detain, and arrest him; (2) his confession was involuntary; (3) there was insufficient evidence to find physical injury; (4) he received ineffective assistance of counsel; and (5) concurrent inclusory counts should be dismissed. (Pet. 2, ECF No. 1; Pet'r's Mem. of Law 35, ECF No. 1-2.) Respondent filed its memorandum of law in opposition to the petition on August 24, 2017. (ECF No. 7.) Petitioner filed a reply on January 8, 2018. (ECF No. 10.) The Court has fully considered the arguments and submissions of the parties.

II. STANDARD OF REVIEW

To determine whether a petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254. "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the

Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit added that, while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are review *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir. 2006)).

III. DISCUSSION

Petitioner argues that he is entitled to habeas relief on five grounds: (1) his arrest was the product of a Fourth Amendment violation; (2) his confession was involuntary; (3) there was insufficient evidence to find physical injury; (4) he received ineffective assistance of counsel; and (5) concurrent inclusory counts should be dismissed. For the following reasons, the Court concludes that petitioner is not entitled to habeas relief, and denies the instant petition in its entirety.

A. Procedural Bar

As a threshold matter, respondent argues that two of petitioner's grounds for habeas relief are procedurally barred from habeas review by this Court. Specifically, respondent argues that petitioner failed to preserve the Fourth Amendment claim and the legal sufficiency claim with respect to the proof of physical injury. For the reasons set forth below, this Court agrees that these claims are procedurally barred. In addition, even assuming *arguendo* that these claims are not barred from review, they are without merit.

1. Independent and Adequate State Ground

A petitioner's federal claims may be procedurally barred from habeas corpus review if they were decided at the state level on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729-33 (1991). To be independent, the "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case," *Harris v. Reed*, 489 U.S. 255, 261-62 (1989), by "'clearly and expressly' stat[ing] that its judgment rests on a state procedural bar," *id.* at 263 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985)). The procedural rule at issue is adequate if it is "'firmly established and regularly followed' by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1999)). In addition, a state court's reliance on an independent and adequate procedural bar precludes habeas review even if the state court also rejected the claim on the merits in the alternative. *See, e.g.*, *id.* at 264 n.10 (holding that "a state court need not fear reaching the merits of a federal claim in an *alternative* holding," so long as the state court "explicitly

7

invokes a state procedural bar rule as a separate basis for decision" (emphasis in original)); *Glenn v. Bartlett,* 98 F.3d 721, 725 (2d Cir. 1996) (same).

The procedural bar is based on the "comity and respect" that state judgments must be accorded. *House v. Bell,* 547 U.S. 518, 536 (2006). Its purpose is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees fit. *Coleman,* 501 U.S. at 730-31. Generally, the Second Circuit has deferred to state findings of procedural default as long as they are supported by a "fair and substantial basis" in state law. *Garcia,* 188 F.3d at 78. However, there is a "small category" of "exceptional cases in which [an] exorbitant application of a generally sound [procedural] rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376, 381 (2002). Nevertheless, "principles of comity . . . counsel that a federal court that deems a state procedural rule inadequate should not reach that conclusion 'lightly or without clear support in state law.'" *Garcia*, 188 F.3d at 77 (quoting *Meadows v. Holland,* 831 F.2d 493, 497 (4th Cir. 1987) (en banc), *vacated on other grounds*, 489 U.S. 1049 (1989)).

If a claim is procedurally barred, a federal habeas court may not review the claim on the merits unless the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Coleman*, 501 U.S. at 750. Petitioner may demonstrate cause by showing one of the following: "(1) the factual or legal basis for a petitioner's claim was not reasonably available to counsel, (2) some interference by state officials made compliance with the procedural rule impracticable, or (3) the procedural default was the result of ineffective assistance of counsel." *McLeod v. Graham*, No. 10 Civ. 3778 (BMC), 2010 WL 5125317, at *3 (E.D.N.Y. Dec. 9, 2010) (citing *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994)). Prejudice can be demonstrated by showing that the error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003). A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To overcome procedural default based on miscarriage of justice, petitioner must demonstrate that "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" and would require "new reliable evidence . . . that was not presented at trial." *House*, 547 U.S. at 536-37.

2. New York's Preservation Doctrine

On direct appeal, the Second Department concluded that petitioner's claims challenging his warrantless arrest under *Aguilar-Spinelli* and his contention that there was insufficient evidence relating to physical injuries to the victims were unpreserved for review under C.P.L. § 470.05. *Cruz*, 137 A.D.3d at 1159.

"New York's contemporaneous objection rule provides that a party seeking to preserve a claim of error at trial must lodge a protest to the objectionable ruling 'at the time of such ruling . . . or at any subsequent time when the [trial] court had an opportunity of effectively changing the same.'" *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) (quoting C.P.L. § 470.05(2)). "New York courts consistently interpret § 470.05(2) to require that a defendant specify the grounds of alleged error in sufficient detail so that the trial court may have a fair opportunity to rectify any error." *Garvey v. Duncan*, 485 F.3d 709, 715 (2d Cir.

8

2007) (citation omitted). Thus "[a] general objection is not sufficient to preserve an issue" because a "defendant must specifically focus on the alleged error." *Id.* at 714 (collecting authority); *see also, e.g.*, *McCall v. Capra*, 102 F. Supp. 3d 427, 445 (E.D.N.Y. 2015) ("'The word objection alone [is] insufficient to preserve the issue for [appellate] review' in the New York state courts." (quoting *People v. Tevaha*, 644 N.E.2d 1342, 1342 (N.Y. 1994))); *Umoja v. Griffin*, No. 11 CV 0736(PKC)(LB), 2014 WL 2453620, at *21 (E.D.N.Y. May, 29 2014) (holding that petitioner's claim was procedurally barred despite "petitioner's counsel's timely object[ions]" because "counsel was not specific in his objections"); *Adams v. Artus*, No. 09–cv–1941 (SLT)(VVP), 2012 WL 1077451, at *7 (E.D.N.Y. Feb. 24, 2012) (finding that because counsel "twice only stated 'Objection' . . . these objections did not likely meet the specificity required to be preserved on appeal under New York's preservation rule.").

The Second Circuit has "held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule." *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) (first citing *Whitley*, 642 F.3d at 286-87; then citing *Richardson v. Greene*, 497 F.3d 212, 219 (2d Cir. 2007); then citing *Garvey*, 485 F.3d at 718; then citing *Taylor v. Harris*, 640 F.2d 1, 2 (2d Cir. 1981) (per curiam)). Furthermore, the Second Circuit has "observed and deferred to New York's consistent application of its contemporaneous objection rules." *Garcia*, 188 F.3d at 79 (citation omitted); *see also Bossett*, 41 F.3d at 829 n.2 (respecting state court's application of § 470.05(2) as an adequate bar to federal habeas review); *Fernandez v. Leonardo*, 931 F.2d 214, 216 (2d Cir. 1991) (noting that failure to make objection at trial constitutes adequate procedural default under § 470.05(2)). Thus, the New York preservation doctrine provides an independent and adequate ground for decision on habeas review.

3. Application

a. Fourth Amendment Claim

The Court concludes that petitioner's claim regarding the alleged lack of probable cause for his arrest because the government failed to satisfy the *Aguilar-Spinelli* test is procedurally barred because this claim was decided at the state level on independent and adequate state procedural grounds.

On direct appeal, the Second Department found that this claim was "unpreserved for appellate review, since the defendant failed to raise this specific argument in support of suppression before the hearing court," and was nonetheless meritless. *Cruz*, 137 A.D.3d at 1159 (citing C.P.L § 470.05[2]). As discussed, New York's preservation doctrine is an independent and adequate ground for decision on habeas review.

Furthermore, petitioner has not demonstrated cause for the default, prejudice, or a miscarriage of justice. Petitioner has not demonstrated cause for the default because the factual and legal basis for petitioner's claim was available to counsel, there was no interference by state officials that made compliance with the procedural rules impracticable, and, as discussed below, counsel was not ineffective for deciding not to raise the Fourth Amendment claim. Additionally, petitioner has not demonstrated prejudice or a miscarriage of justice because, as discussed below, the claim is meritless and would not have affected the trial. Therefore, because the Fourth Amendment claim was procedurally barred on independent and adequate state grounds, and because petitioner has not shown cause for the default, prejudice, or a miscarriage of justice, the claim is

procedurally barred from habeas corpus review.

b. Legal Sufficiency Claim

Petitioner claims there was legally insufficient evidence to establish the victims' injuries. The Second Department found that this claim was "unpreserved for appellate review, as it was not raised with specificity in his motion for a trial order of dismissal." *Cruz*, 137 A.D.3d at 1159. The Second Department also rejected petitioner's claims on the merits. *Id.* Although the Second Department alternatively addressed the merits of the legal sufficiency claim, it nevertheless relied on the procedural bar as an independent basis for its disposition of the claim. The Second Department clearly expressed that its judgment rests on the state procedural bar, by stating the claim was unpreserved and by citing C.P.L. § 470.05(2). *Id.* at 1159.

Further, petitioner has not established cause for the default, nor has he demonstrated prejudice or a miscarriage of justice because, as discussed *infra*, the claim is meritless and would not have affected the trial. Because the legal sufficiency claim was procedurally barred on independent and adequate state grounds, and because petitioner has not shown cause for the default, prejudice, or a miscarriage of justice, the claim is procedurally barred from habeas corpus review.

B. Merits

1. Fourth Amendment

As already noted, the Fourth Amendment claim is procedurally barred. In an abundance of caution, the Court has considered this claim, and finds it to be without merit.

Petitioner argues that he is entitled to habeas relief because his arrest violated the Fourth Amendment. Specifically, petitioner argues that the police officers lacked probable cause and reasonable suspicion to arrest him. The Court disagrees. As set forth below, petitioner is not entitled to relief on this ground because: (1) petitioner had a full and fair opportunity to litigate this Fourth Amendment claim in state court; (2) the two-prong *Aguilar-Spinelli* test that petitioner relies upon is a legal doctrine of state, not federal, law; and (3) the claim is without merit.

a. Petitioner had a full and fair opportunity to litigate this Fourth Amendment claim in state court.

i. Legal Standard

It is well-settled that "[w]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). The Second Circuit has further explained that, under *Powell*, "review of fourth amendment claims in habeas petitions would be undertaken in only one of two instances: (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992) (citing *Gates v. Henderson*, 568 F.2d 830, 839 (2d Cir. 1977) (en banc)). Courts have viewed such a breakdown to occur when the state court "failed to conduct a reasoned method of inquiry into the relevant questions of fact and law." *Capellan*, 975 F.2d at 71 (citations and quotations omitted).

ii. Application

With respect to the existence of corrective procedures, it is clear that New York has

adequate corrective procedures, which are set forth in New York Criminal Procedure Law ("C.P.L.") § 710.10, *et seq.*, for litigating Fourth Amendment claims. *See, e.g.*, *Capellan*, 975 F.2d at 70 n.1 ("[T]he 'federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate.'" (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989))). Moreover, in the instant case, there is absolutely no evidence of an unconscionable breakdown in the underlying process. To the contrary, petitioner was afforded a pre-trial suppression hearing at which his counsel could have made, but did not make, the *Aguilar-Spinelli* argument. On appeal, the Second Department concluded that this claim was unpreserved for appellate review, and that in any event, there was probable cause for arrest. *Cruz*, 137 A.D.3d at 1159. Thus, the record reveals no "'disruption or obstruction of a state proceeding' typifying an unconscionable breakdown," *Capellan*, 975 F.2d at 70 (quoting *Shaw v. Scully*, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)); rather, the record clearly establishes that the state court conducted a reasoned and thorough method of inquiry into the relevant facts. In short, having fully availed himself of New York's corrective procedures regarding his Fourth Amendment claim, petitioner has had an opportunity for full and fair litigation of the claim and may not raise it on federal habeas review. *See, e.g.*, *Garret v. Smith*, 2006 WL 2265094, at *8 (E.D.N.Y. Aug. 8, 2006).

1. The *Aguilar-Spinelli* test is a legal doctrine of New York State law

i. Legal Standard

For the purposes of federal habeas corpus review, a habeas petition can only be granted to remedy some violation of federal law. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (citations omitted) ("[F]ederal habeas corpus does not lie for errors of state law . . . In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

"*Aguilar, Spinelli*, and their progeny focus on whether information provided by an anonymous informant is sufficiently reliable to support a warrant without other supporting information." *Greene v. Brown*, No. 06 Civ. 5532(LAP)(GWG), 2010 WL 1541429, at *1 (S.D.N.Y. Apr. 15, 2010) (citing *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)); *see also Spinelli v. United States*, 393 U.S. 410 (1969); *Aguilar v. Texas*, 378 U.S. 108 (1964). The Supreme Court has "abandoned the two-pronged *Aguilar-Spinelli* test for determining whether an informant's tip suffices to establish probable cause for the issuance of a warrant and substituted in its place a 'totality of the circumstances' approach.'" *United States v. Leon,* 468 U.S. 897, 904 n.5 (1984) (citing. *Illinois v. Gates,* 462 U.S. 213 (1983)). However, New York state law has rejected the federal approach, and adheres to the more stringent requirements of the *Aguilar-Spinelli* test. *See Freeman v. Kadien*, 684 F.3d 30, 34 (2d Cir. 2012). The *Aguilar-Spinelli* test is a specific doctrine under New York state law and, thus, is not cognizable on federal habeas review. *See id.* (citing *People v. Griminger*, 71 N.Y.2d 635, 639 (1988)).

ii. Application

The Court concludes that petitioner's claim that there was no probable cause to arrest because the *Aguilar-Spinelli* test was not satisfied presents a question of state law that is not cognizable on federal habeas review. *See Freeman*, 684 F.3d at 34.

In any event, even assuming *arguendo* that this Court could review petitioner's Fourth Amendment *Aguilar-Spinelli* claim, the claim is meritless. Here, the Second Department concluded that the police were

"required to meet the less demanding reasonable suspicion standard" to stop the vehicle in which petitioner was a passenger, and did so "on the basis of the information a police sergeant received from police radio transmissions." *Cruz*, 137 A.D.3d at 1158. Further, the Second Department concluded that, "[r]easonable suspicion then escalated to probable cause for arrest when, according to the police sergeant's hearing testimony, the defendant 'knock[ed]' the police sergeant off of him and fled the scene . . . ." *Id.*

The Court agrees that, under New York law, the detailed description that Sergeant Lezamiz received from the radio transmission, including a description of the occupants in the car, the color, make, and model of the car, as well as the distinguishing characteristics of the car including the bumper stickers and the spotlight on the roof were sufficient to give rise to reasonable suspicion to stop the car. *See People v. Ceruti*, 133 A.D.3d 610, 610 (N.Y. App. Div. 2015) ("[T]he police had reasonable suspicion to stop the vehicle that [the defendant] was driving based upon a radio transmission indicating, *inter alia*, the make and color of the vehicle allegedly involved in the robbery . . . ."). Additionally, the Court notes that Sergeant Lezamiz's use of handcuffs during the stop, upon the suspicion that petitioner had a weapon (H. 25-26), and with the understanding that a handgun had been used during the home invasion (H. 17), did not transform the stop into an arrest. *See United States v. Fiseku*, 915 F.3d 863, 873 (2d Cir. 2018) (finding no Fourth Amendment violation when officer handcuffed suspects during an investigatory stop where he came across three suspects in the woods and his "goal was not simply to identify the men, but to confirm or rebut his suspicion that they had committed, or were poised to commit, a home invasion or some other crime" and "the likelihood of ongoing or imminent criminal activity heightened the risk that one or more suspects might be armed and that they might attempt to fight or flee"); *People v. Medina*, 37 A.D.3d 240, 242 (N.Y. App. Div. 2007) ("The police conducted a lawful investigatory detention, fully supported by reasonable suspicion that defendant had been involved in a violent crime, and this detention was not transformed into an arrest when the police ordered defendant out of his vehicle, placed him on the ground in handcuffs, and held him for approximately 30 minutes, since all of these police actions were justified by the particular exigencies involved in the investigation . . . ."). Further, the Court agrees that reasonable suspicion escalated to probable cause to arrest once petitioner fled the scene. *See People v. McDonald*, 285 A.D.2d 615, 615-16 (N.Y. App. Div. 2001) (reasonable suspicion to stop vehicle based on information contained in radio transmission escalated to probable cause when defendant fled from the scene).

Thus, based on a review of the record, the Court concludes that the Second Department's decision that there was probable cause to arrest was neither contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence. Thus, the Court rejects petitioner's claim on the merits.

2. Voluntariness of Confession Claim

Petitioner claims that his confession should be suppressed because it was involuntary. Specifically, he contends that the statements he made after he received *Miranda* warnings were coerced because he was "deprived of food, water, sleep for 36 to 38 hours of interrogation." (Pet. 7.) The Court finds this claim to be without merit.

a. Legal Standard

The "ultimate issue of voluntariness [of a confession] is a legal question requiring independent federal determination." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) (citing *Arizona v. Fulminante*, 499 U.S. 279,

12

287 (1991)); *see also Mincey v. Arizona*, 437 U.S. 385, 396 (1978) (holding that the Court is not bound by a state court's determination that a statement was voluntary; "[i]nstead, the Court is under a duty to make an independent evaluation of the record"); *Nova v. Bartlett*, 211 F.3d 705, 707 (2d Cir. 2000). Factual questions underlying a legal determination are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Nelson*, 121 F.3d at 833. However, the Second Circuit has noted that "the statutory presumption refers to historical facts, that is, recitals of external events and the credibility of the witnesses narrating them." *Id.* (internal quotation marks omitted) (quoting *Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988)). Thus, "[i]f 'the material facts were not adequately developed at the State court hearing or the District Court finds that the factual determination is not fairly supported by the record,' the presumption of correctness is set aside." *Id.* (quoting *Pagan v. Keene*, 984 F.2d 61, 64 (2d Cir. 1993)).

When evaluating the voluntariness of a confession, no one factor is determinative; rather, the totality of the circumstances must be evaluated. *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988). The factors to be considered include (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials. *Id.* at 901-02.

b. Application

Petitioner contends that his confession was coerced because he was in custody for 36 to 38 hours, was "unable to speak English," was "barely naked in a hospital gown . . . and a bloody face [because he was beaten to a pulp while being interrogated]" and "food only being provided after the fact of the constitutional violation had taken place" (Pet'r's Reply 16), and was denied the ability to use the bathroom or sleep, (Pet'r's Memo. of Law 22-24).

However, there is sufficient evidence to support the Second Department's determination that petitioner voluntarily made incriminating statements after being advised of his *Miranda* rights. *See Cruz*, 137 A.D.3d at 1158. As an initial matter, the factual findings were made after extensive development of the material facts at the suppression hearing. The hearing court determined that, although petitioner was detained for a day and a half (aligning with petitioner's assessment of how long he was in custody), he was not interrogated continuously over that period, and was only actually questioned for slightly over three hours. (*See* Hg. Ct. Decision 7, ECF No 7-7.) Further, the hearing court concluded that petitioner was offered food and water, was given the opportunity to sleep, did not complain of fatigue, and was not denied the ability to use the bathroom. (*See id.* at 13; H. 694, 702-03, 790-94, 796-97.) Additionally, Detective Espina advised petitioner of his *Miranda* rights prior to questioning, and petitioner waived each right and indicated his understanding of the rights by writing "yes" next to the question "do you understand" (which was written and answered in Spanish) and by signing the rights card. (H. 495-98, 501-03 697-701.) Before petitioner signed a written statement that Detective Espina prepared, and which petitioner did not edit or alter, petitioner again waived his rights by initialing the second and third paragraphs of the statement which restated petitioner's *Miranda* rights. (H. at 606-07.) Further, Detective Espina spoke to petitioner in Spanish (H. 482), and did not have his service weapon on him at any point when questioning petitioner (H. 483).

Here, the totality of the circumstances, including that petitioner was questioned in Spanish for an aggregate period of

13

approximately three hours, was not deprived of food, water, or sleep, or the ability to use the bathroom, and that petitioner waived his *Miranda* rights, do not suggest that petitioner's confession was the product of conduct that would overbear his will to resist. Thus, the evidence in the record supports the conclusion that petitioner's confession was "the product of an essentially free and unconstrained choice by its maker." *United States v. Moreno,* 701 F.3d 64, 76 (2d Cir. 2012) (internal quotation marks omitted) (quoting *United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988)). In sum, the state court's determination on this issue was not contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence. Accordingly, habeas relief on this ground is denied.

3. Insufficient Evidence of Physical Injury

Petitioner claims generally in his habeas petition that there was "legal insufficiency of evidence" and that "the evidence failed to prove elements of charge." (Pet. 8.) However, in the supporting memorandum of law, petitioner focuses on the evidence with respect to proof of physical injury to Sumra and Muzafar. (Pet'r's Memo. of Law 27.) Though the Court concludes that this claim is unpreserved for appellate review, in an abundance of caution, the Court has considered this claim on the merits, and finds it to be without merit.

a. Legal Standard

The law governing habeas relief from a state conviction based on insufficiency of the evidence is well established. A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in an application for a writ of habeas corpus. *Einaugler v. Supreme Court of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997). A criminal conviction in state court will not be reversed if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Policano v. Herbert*, 507 F.3d 111, 115-16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" (quoting *Jackson*, 443 U.S. at 324)); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). A criminal conviction will stand so long as "a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolves any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson*, 443 U.S. at 326).

When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

b. Application

Petitioner contends that there was insufficient evidence to establish Sumra's and Muzafar's physical injury, and that physical

injury is an element of multiple charges of which petitioner was convicted. (Pet. 8; Pet'r's Memo. of Law 27.)

Viewing the facts in the light most favorable to the prosecution, the Court finds that, based on the evidence in the underlying record, a rational trier of fact could have certainly found proof beyond a reasonable doubt that Sumra and Muzafar suffered physical injuries, as that term is defined under New York law. "'Physical injury' as used in the Penal Law, means 'impairment of physical condition or substantial pain.'" *People v. Chiddick*, 8 N.Y.3d 445, 447 (2007) (quoting Penal Law § 10.00(9)). "'[S]ubstantial pain' cannot be defined precisely, but it can be said that it is more than slight or trivial pain. Pain need not, however, be severe or intense to be substantial." *Id.* In *Chiddick*, the New York Court of Appeals articulated several factors relevant to determining whether substantial pain existed, stating that:

> Perhaps most important is the injury defendant inflicted, viewed objectively. . . Also important is the victim's subjective description of what he felt; sometimes an objective account of the injury, unaccompanied by testimony about the degree of pain the victim experienced, will be enough . . . but sometimes it will not . . . . It is also relevant that [the victim] sought medical treatment for the wound defendant inflicted--an indication that his pain was significant. And finally, the legislative history of the Penal Law shows that the motive of the offender may be relevant . . . . Motive is relevant because an offender more interested in displaying hostility than in inflicting pain will often not inflict much of it.

*Id.* at 447-48 (internal citations omitted).

Considering these factors, the Court concludes that there was legally sufficient evidence to establish both Muzafar's and Sumra's injuries. With respect to Muzafar, jurors heard testimony from Muzafar that she was beaten by petitioner and the other co-defendants, and at the time of the trial was still experiencing pain. (Tr. 350.) Further, jurors heard testimony from Sumra and an ambulance medical technician ("AMT") that Muzafar had a bloody nose, and was in an ambulance. (Tr. 351.) The prosecution also presented evidence of ligature marks on Muzafar's hands and a red mark on Muzafar's neck to the jury. (Tr. 237-38, 244.) Muzafar testified that the red mark was from a knife being held to her throat, and the AMT confirmed that the mark was consistent with having been caused by a sharp object. (Tr. 244, 365-66.) The prosecution also presented evidence in the form of Muzafar's medical records, which indicated that her pain was rated as an eight out of ten, and that the doctor found injuries on her neck, chest, abdomen, shoulder, and stomach. (Resp't's Br. 12 (citing People's Ex. 9 at 3-5.)). The Court concludes that this evidence is legally sufficient to conclude that Muzafar suffered physical injury.

The Court further concludes that there was legally sufficient evidence to establish Sumra's injuries. Jurors heard testimony from the AMT who attended to Sumra that Sumra had redness on his neck and an indentation on his bicep that was consistent with blunt force trauma. (Tr. 272-273.) Both the AMT and Sumra testified that Sumra was treated in an ambulance. (Tr. 272, 603.) The jury also heard testimony that Sumra experienced pain in his shoulder, neck, face, and lip. (Tr. 272-73, 275, 603.) The prosecution presented

15

evidence that Sumra rated his pain at an eight out of ten. (Resp't's Br. 12 (citing People's Ex. 11 at 5, 7)). The medical records also established that Sumra was prescribed Toradol for his pain. (*Id.* (citing People's Ex. 1 at 9)). Thus, the Court concludes with respect to Sumra that there was sufficient evidence to support the jury's finding of physical injury.

Given the overwhelming evidence of significant physical injury to both Muzafar and Sumra presented at trial, petitioner's claim that there was legally insufficient evidence for his conviction on multiple counts involving causing physical injury fails on the merits.

4. Ineffective Assistance of Counsel

Petitioner contends that he received ineffective assistance of trial counsel because counsel "failed to make timely objections and failed to challenge the people's evidence." (Pet. 10.) In his memorandum of law in support of the petition, petitioner more specifically alleges that his trial counsel (1) failed to assert affirmative defenses; (2) failed to argue that petitioner's arrest lacked probable cause at the pre-trial suppression hearing; and (3) failed to object to the admission of a three-page subscriber sheet for cellphone records belonging to co-defendant Guerrero. (Pet'r's Memo. of Law 31-33.) As discussed below, the Court finds each of petitioner's ineffective assistance claims to be without merit.

a. Legal Standard

Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

The first prong requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of trial counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Greiner*, 417 F.3d at 319 (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)). In assessing performance, a court must apply a "heavy measure of deference to counsel's judgments." *Greiner*, 417 F.3d at 319 (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *id.* (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 690). Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *DeLuca*, 77 F.3d at 588 (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 690-91).

The second prong focuses on prejudice to the petitioner. The petitioner is required to show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this

context, "reasonable probability" means that the errors are of a magnitude such that they "undermine[] confidence in the outcome." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 694). "The question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 695).

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of *Strickland*, the determination of prejudice 'may be made with the benefit of hindsight.'" *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007) (quoting *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994)).

b. Application

As a threshold matter, the Court notes that petitioner's ineffective assistance of counsel arguments were rejected by the Second Department on the merits. *Cruz*, 137 A.D.3d at 1160 (noting that petitioner "received the effective assistance of counsel"). Thus, because the Second Department's decision was an "adjudicat[ion] on the merits," *see* 28 U.S.C. § 2254(d), it is entitled to the deferential standard of review under AEDPA. *See, e.g.*, *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) ("When the state court has adjudicated the merits of the petitioner's claim, we apply the deferential standard of review established by [AEDPA] . . . .").

i. Failure to assert an affirmative defense

Petitioner claims that his trial counsel was ineffective for failing to request that the court charge the jury with the affirmative defense, contained within N.Y.P.L. § 160.15(4) and N.Y.P.L. § 140.30(4), that a firearm displayed "was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged." (Pet'r's Memo. of Law 31). The Court disagrees.

As discussed above, "[a] lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision." *DeLuca*, 77 F.3d at 588 n.3. Further, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 690).

Counsel's decision not to pursue an affirmative defense that would have contradicted his theory of the case, which was a mistaken identity theory (Tr. 1080), is a sound trial strategy, *see People v. Diaz*, 149 A.D.3d 974, 974-75 (N.Y. App. Div. 2017); *People v. Casseus,* 120 A.D.3d 828, 829 (N.Y. App. Div. 2014). In *Diaz*, the defendant claimed ineffective assistance of counsel at trial because of counsel's failure "to request that the jury be charged on the affirmative defense to robbery in the first degree and burglary in the first degree that the object displayed was not a loaded weapon from which a shot, capable of producing death or other serious physical injury, could be discharged." 149 A.D.3d at 974. The court in *Diaz* held that counsel's decision to not pursue that affirmative defense was a legitimate decision and did not equate to ineffective assistance of counsel because pursuing the affirmative defense would have required the

17

defense to introduce evidence that would undermine its own defense of misidentification. *Id.* at 975. Further, the trial court "was not required to give the charge *sua sponte*, since such an instruction would have interfered with the defendant's theory of the case." *Id.*

As in *Diaz*, here, counsel's decision not to assert the affirmative defense when it would contradict his misidentification theory of the case was a sound trial strategy. Had counsel pursued the affirmative defense, he would have had to introduce evidence that contradicted the misidentification theory to establish that the gun was not capable of discharging a shot. Thus, counsel's decision not to pursue the affirmative defense in order to maintain defendant's theory of misidentification does not "[fall] below an objective standard of reasonableness," *Strickland*, 466 U.S. at 694, such that habeas relief is warranted.

In any event, even assuming *arguendo* that counsel erred in not requesting that the court charge the jury with the affirmative defense, petitioner cannot demonstrate that he was prejudiced by counsel's failure to do so. Petitioner has not adduced any evidence that the firearm was unloaded, and as such there is no indication whatsoever that an affirmative defense relying on proof that the gun was unloaded would have been successful. Thus, the Court concludes that the Second Department's conclusion that petitioner received effective assistance of counsel was neither contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. Accordingly, this ground does not provide a basis for habeas relief.

ii. Failure to argue that petitioners arrest lacked probable cause

Petitioner claims his trial counsel was ineffective for failing to object at the suppression hearing to "the arrest of petitioner sans the requisite probable cause." (Pet'r's Mem. of Law 35; *see* Pet'r's State Appellate Br., 60.) As set forth below, the Court finds this claim to be without merit.

As an initial matter, the Court notes that petitioner's trial counsel did litigate a motion to suppress "property seized as a result of an unlawful search and seizure vis-à-vis warrantless arrests, reasonable suspicion/probable cause, a vehicle search, consents, to search, and whether property was abandoned" and a hearing was held on these motions. (Hg. Ct. Decision 2.) Thus, petitioner's claim that his attorney was ineffective for failing to make this motion fails at the outset. *See United States v. Stevens*, 2002 WL 31111779, at *3 (E.D. Pa. Sept. 19, 2002) ("Counsel moved to suppress the evidence . . . . Petitioner is not entitled to claim ineffective assistance of counsel merely because he lost the motion.").

However, even assuming *arguendo* that petitioner's trial counsel had failed to make the motion, as a general matter, in order to show ineffective assistance of counsel for failure to make a motion to suppress, "the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." *United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375-76 (1986)).

The Court concludes that petitioner's claim is without merit as the requisite probable cause for arrest existed, as discussed above in the Court's discussion of petitioner's Fourth Amendment claim. As the Court concluded

18

with respect to the Fourth Amendment claim, the Court agrees with the Second Department that there was reasonable suspicion to stop the car based on the information received over the radio transmission regarding the description of the car, and petitioner's flight from that officer gave rise to probable cause for his arrest. *See Cruz*, 137 A.D.3d at 1159. Thus, petitioner cannot demonstrate prejudice on any issues that petitioner has with respect to counsel's handling of the Fourth Amendment claim.

iii. Failure to object to the admission of the three-page subscriber sheet for the cellphone records

Petitioner claims that his trial counsel was ineffective for failing to object to the admission of a three-page subscriber account sheet, which would have made the call detail log of co-defendant Guerrero inadmissible because the subscriber sheets are not business records. (Pet. 35; Pet'r's State Appellate Br. 61.) Petitioner adopts his argument from his direct appeal, which is that "[w]ithout these separate three-page subscriber account sheets, the call detail logs . . . would not have been admissible and all of the cellphone evidence would have been excluded." (Pet'r's State Appellate Br. 61.) As set forth below, the Court finds this claim to be without merit.

As an initial matter, the Court concludes that the subscriber account sheets were not hearsay, but rather were properly admitted for a nonhearsay purpose, and thus any objection to their admission would have been meritless. In *People v. Patterson*, the New York Court of Appeals held that subscriber information, as it relates to cellphone records, is not hearsay where it is used to "to show that the account had some connection to the defendant" and not for the truth of the contents of the subscriber information, because "it was simply irrelevant whether the information was true or false and the cellphone company representatives testified that the evidence was not verifiable."

28 N.Y.3d 544, 552 (2016). As in *Patterson*, the subscriber sheets were not offered into evidence for the truth of their contents, but rather were offered to demonstrate some connection between petitioner's cellphone and those of his co-defendants during the relevant time period relating to the underlying crime. (*See* Tr. 1130.) Indeed, Ricardo Leal ("Leal"), a subpoena analyst at Sprint/Nextel, testified that "anything that's given [for subscriber information] is not checked by the corporation. It is what it is. It could be false or it could be true . . . . It's not verified in any way." (Tr. 675.) Thus, the Court concludes that, as in *Patterson*, the subscriber sheets were offered for the limited nonhearsay purpose of providing information linking the defendant to a particular cellphone, and trial counsel properly did not object to their admission.

Moreover, even assuming that counsel had objected to the subscriber sheets on the basis that they would not fall under the business records exception (though any such objection would have failed as the subscriber sheets were offered for a nonhearsay purpose), any such objection would not have prevented the admission of the cellphone records into evidence. *See People v. Bonhomme*, 85 A.D.3d 939, 940 (N.Y. App. Div. 2011) (the trial court "properly admitted the defendant's cellphone records through the testimony of the Sprint Nextel records custodian, who testified that she was familiar with the record-keeping practices of the company, that the defendant's cellphone records were made in the course of regular business, that it was the regular business to make the records, and that the records were made contemporaneously with incoming and outgoing phone calls."). Similar to the testimony that led to the admission of the cellphone records in *Bonhomme*, Leal's testimony here was that he was familiar with the records that are kept by Sprint/Nextel, the records are kept over the course of regular business, and the records are made at the time

19

the events occur. (Tr. 670-73.) Thus, petitioner's contention that the cellphone records would not have been admitted without the admission of the subscriber records is unavailing. Because the subscriber sheet was properly admitted for a limited nonhearsay purpose, and the cellphone records were admissible under the business records exception rule, petitioner's claim that his counsel was ineffective for failing to object to the subscriber sheets admission into evidence lacks merit.

5. Inclusory Concurrent Counts

a. Legal Standard

Claims that present issues of purely state law are not cognizable under federal habeas corpus review. *E.g. Estelle*, 502 U.S. at 67-68 (holding that "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States"). Generally, issues of inclusory concurrent counts are purely matters of state law. *See Daughtry v. Conway*, 2006 WL 2850260, at *18 (S.D.N.Y. Sep. 29, 2006); *Gardner v. Greiner*, 2000 WL 863956, at *3 (E.D.N.Y. Jun. 21, 2000).

b. Application

Here, the Court concludes that petitioner's inclusory concurrent counts claim invokes only issues of state law. Petitioner claims that although "federal habeas courts have deemed claims of concurrent inclusory counts as not cognizable under federal habeas petitions, some . . . have in the interest of justice deemed such claims to be cognizable." (Pet'r's Mem. of Law 36 (citing *Daughtry*, 2006 WL 2850260, at *18)). However, although the *Daughtry* court noted that the state appellate court could, in its discretion, modify a sentence in the interest of justice, the *Daughtry* court did *not* find the inclusory concurrent count cognizable on federal habeas review. *See Daughtry*, 2006 WL 2850260, at

*18. Here, as in *Daughtry*, petitioner did not frame his "sentencing claim in constitutional terms, or allege a violation of federal law," and as such, this claim is not cognizable on federal habeas review. *Id.* Thus, the Court concludes that this claim presents an "issue of purely state law" and "is not cognizable under federal habeas corpus review." *Estelle*, 502 U.S. at 67-68.

### III. CONCLUSION

For the foregoing reasons, petitioner has demonstrated no basis for relief under 28 U.S.C. § 2254. Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). The Clerk of the Court shall close this case.

SO ORDERED.

JOSEPH F. BIANCO
United States Circuit Judge (sitting by designation)

Dated: August 14, 2019
Central Islip, New York

\* \* \*

Petitioner proceeds *pro se*. Respondent is represented by Madeline Singas, District Attorney, Nassau County, 262 Old Country Road, Mineola, New York 11501.